UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 3:11-cv-30181-FDS

ANDREW SURPRISE,

Plaintiff

v.

THE INNOVATION GROUP, INC. / FIRST NOTICE SYSTEMS, INC. and TERRY RONAN,

Defendants

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Andrew Surprise ("Plaintiff" or "Surprise" hereinafter) respectfully requests that the Court deny the Defendant, The Innovation Group, Inc./First Notice Systems, Inc. ("Defendant Innovation" or collectively as "Defendants" hereinafter) and the Defendant, Terry Ronan's ("Defendant Ronan" or collectively as "Defendants"), Motion for Summary Judgment, as genuine issues of material fact remain to be tried. Specifically, genuine issues of material fact include, but are not limited to: (1) whether the Plaintiff was terminated for enaging in protected activity under the Americans with Disabilities Act ("ADA") and M.G.L. c. 151B; (2) whether the Plaintiff was terminated for attempting to exercise his rights under the Family Medical Leave Act ("FMLA"); and (3) whether the Plaintiff was terminated in violation of public policy for reporting what he believed to be (and are) violations of the law. The following argument illustrates these genuine issues which preclude summary judgment.

## STATEMENT OF MATERIAL FACT IN DISPUTE

The Plaintiff's Statement of Material Facts in Dispute ("SOF") is filed herewith and incorporated by reference into this Memorandum. Specific paragraphs to Plaintiff's Statement of Material Facts in Dispute are referenced by the designation "SOFs, ¶ ___."

## ARGUMENT

### I. SUMMARY JUDGMENT SHOULD NOT BE GRANTED AS MATERIAL ISSUES OF FACT REMAIN AS RELATES TO DISCRIMINATORY INTENT.

The First Circuit has urged courts to use restraint in granting summary judgment once a plaintiff has established a *prima facie* case of discrimination and pretext becomes the issue. Hodgens v. General Dynamics Corporation, 144 F.3d 151, 167 (1st Cir. 1998)(internal citation omitted). The Hodgens court pointed out:

> Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty of accurately determining whether an employer's motive is legitimate or is a pretext for discrimination, there is reason to be concerned about the possibility that an employer could manipulate its decisions to purge employees it wanted to eliminate. See Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3rd Cir. 1990)(subjective evaluations of performance 'are more susceptible of abuse and more likely to mask pretext' than objective job qualifications)(internal quotation marks omitted).

Id. Other Circuit courts and the United States Supreme Court support such restraint. The Eighth Circuit has interpreted the U.S. Supreme Court case of Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) as "indicating that":

> [A] plaintiff bringing an employment discrimination claim may succeed in resisting a motion for summary judgment where the evidence, direct or circumstantial, establishes a genuine issue of fact regarding an unlawful motivation for the adverse employment action (i.e. motivation based upon a protected characteristic), even though the plaintiff may not be able to create genuine doubt as to the truthfulness of a different, yet lawful, motivation.

Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir. 2005); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2nd Cir. 2001).

The Massachusetts Appeals Court has reaffirmed the principle that summary judgment is disfavored in employment discrimination cases where an employer's intent is at issue. Holland v. BLH Electronics, 58 Mass. App. Ct. 678 (2003). The court opined:

> We start with the proposition that 'summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment.' Where there is conflicting evidence as to a defendant's discriminatory motive, courts may not dispose of such cases on the basis of affidavits.

Id. at 681 (quoting and citing Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 439-446 (1995).

As shown in the following discussion, the Plaintiff's evidence raises genuine issues of material fact regarding the Defendant's motive for the Plaintiff's termination of employment. Therefore, his claims are appropriately left for a jury to decide at trial. See Hodgens v. General Dynamics Corporation, 144 F.3d at 167 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 [1986]).

## II. DISCRIMINATION BASED UPON REAL OR PERCEIVED DISABILITY

The Plaintiff is proceeding on Counts II (ADA-Retaliation), Count IV (M.G.L. c. 151B—Retaliation), Count V (FMLA Enforcement), Count VI (FMLA-Retaliation), Count VII (M.G.L. c. 151B-Retaliation against Ronan), and Count VIII (Wrongful Termination-Violation of Public Policy). The Plaintiff will not be proceeding on Counts I and III that relate to the Plaintiff's denial of accommodation claims. Therefore, although the Plaintiff's claims for disability discrimination arguably properly fall within the scope of the Plaintiff's EEOC Charge of Discrimination, the Plaintiff will not be pursuing a denial of accommodation claim, mainly

because his physician did not place any restrictions on his ability to perform his daily life activities.

## III. MATERIAL FACTS IN DISPUTE REMAIN AS TO THE PLAINTIFF'S CLAIM THAT HIS EMPLOYMENT WAS TERMINATED IN RETALIATION FOR HAVING COMPLAINED ABOUT WHAT HE BELIEVED TO BE DISCRIMINATORY CONDUCT TOWARD A CO-WORKER.

The Plaintiff does claim retaliation under the ADA and M.G.L. c. 151B as it relates to his complaints of handicap disability discrimination against a co-worker – the security guard. To succeed on a retaliation claim, a plaintiff must prove that he engaged in protected activity; he suffered an adverse employment action; and a causal connection exists between the two. Mole v. University of Massachusetts, 58 Mass. App. Ct. 29 (2003). This causal connection may be established if the alleged retaliatory acts are close in time to the plaintiff's protected activity. Id. at 39. Under this standard, retaliation claims succeed even though the underlying claims of discrimination fail. See, e.g., Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 80–85 (1st Cir. 2001).

As with a claim for discrimination, a plaintiff alleging workplace retaliation must prove, among other things, that he suffered an "adverse employment action" on account of a protected activity. However, "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern, 548 U.S. at 64, 126 S.Ct. 2405; *see also* Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008)("[C]onduct need not relate to the terms or conditions of employment to give rise to a retaliation claim."). Rather, a plaintiff may satisfy this requirement by showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern, 548 U.S. at 64, 126 S.Ct. 2405.

Examples of adverse employment actions in the retaliation context "include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Lapka v. Chertoff, 517 F.3d 974, 986 (7th Cir. 2008) (quoting Crady v. Liberty Nat'l Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)).

**A. The Plaintiff Engaged In Legally Protected Activity.**

**1. Discrimination And Harassment Of Third Parties**

M.G.L. c. 151B §4(4A) states that it should be unlawful practice:

> For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

Furthermore, M.G.L. c. 151B §4(5) states that it should be unlawful practice:

> For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

Contrary to the Defendants' assertions, where M.G.L. c. 151B forbids discrimination and harassment of employees it also protects those who are not part of an employer's employment unit. Thomas O'Connor Constructors, Inc. v. Massachusetts Commission Against Discrimination et al., 72 Mass. App. Ct. 549, 893 N.E.2d 80 (2008)(MCAD order finding defendant general contractor liable for the discriminatory and harassing actions of its employees against plaintiff employee of sub-contractor affirmed).

Similarly, courts have found the potential for employers to be held liable for the actions of third-parties against their employees. Employers have "a duty 'to take prompt action reasonably calculated to end the harassment and reasonably likely to prevent the conduct from recurring.'" Modern Continental/Obayashi v. Massachusetts Commission Against

Discrimination, 445 Mass. 96, 109, 833 N.E.2d 1130 (2005) citing Berry v. Delta Airlines, Inc., 260 F.3d 803, 813 (7th Cir. 2001). However, when determining an employer's duty, the Modern court found that "the ability to 'control' the third party perpetrator is a key factor in determining an employer's liability for sexual harassment perpetrated by that third party." Where the court found no evidence that the defendant employer "encouraged, tacitly condoned it, or that it acquiesced in it" and "took various measures to combat the harassment, which were, despite its lack of 'control' largely successful," defendant employer was found not liable for plaintiff's claims. Id. It has been demonstrated that an employer can be held liable for the actions of its employees against third-parties (i.e. persons outside of the employee unit). In the instant case, the Defendant Innovation had control over its supervisory personnel and failed to even attempt to put a stop to their wrongful discriminatory behavior by its own managers against the security guard. Simply put, the Plaintiff complained about discrimination (or what he believed to be discrimination), thereby engaging in protected activity.

Similar to O'Connor, in the instant case, the Plaintiff as an employee of the Defendant Innovation complained about the discriminatory and harassing environment created by two of the Defendant's supervisors, Vera McCormick ("McCormick") and John Marchese ("Marchese"). SOFs ¶ 84. McCormick and Marchese, on at least three occasions, mimicked the speech impediment of a security guard, an employee of Arrow Security and contracted by the Defendant Innovation. SOFs ¶ 84.

A speech impediment has been found to constitute as a disability under the ADA by limiting the daily life activity of speaking. See McInnis v. Alamo Community College Dist., 207 F.3d 276, 10 A.D. Cas. (BNA) (5th Cir. 2000)(defendant employer motion for summary judgment denied where court found ample evidence that plaintiff employee had been

discriminated against based upon his speech impediment which substantially limited him in the major life activity of speaking). See also, Dudley v. Hannaford Bros. Co., 333 F.3d 299, 14 A.D. Cas. (BNA) 901 (1st Cir. 2003).

The Plaintiff, concerned about the wrongful discriminatory behavior he had observed his supervisors engaging in, complained of discrimination on at least three occasions. SOFs ¶ 84. The Plaintiff stated in his complaints that he had witnessed "discriminatory," disrespectful and unprofessional behavior engaged in by Marchese in relation to his treatment of staff and that he had also witnessed McCormick engaging in similar behavior on the call center floor. SOFs ¶ 84. Specifically, the Plaintiff's comments were in relation to Marchese and McCormick imitating the security guard's speech impediment. SOFs ¶ 84.

The first time that the Plaintiff complained of said discrimination was during a department meeting, in or about April, 2010, with the Defendant Innovation's Quality Assurance Department. SOFs ¶ ¶ 84, 86, 93. The second time that the Plaintiff complained about the discrimination was in or about August, 2010, when he submitted his response to the Defendant Innovations' alleged anonymous online survey. SOFs ¶ ¶ 84, 94. The third time the Plaintiff complained about the discrimination was during the meeting with the Defendant Ronan on September 7, 2010. SOFs ¶ ¶ 84, 95. The Plaintiff provided the Defendant Ronan with a copy of his response to the "anonymous" survey and he and the Defendant Ronan reviewed the document point by point. SOFs ¶ ¶ 84, 95. Specifically, the Plaintiff expressed his concerns regarding his supervisors and managers "discriminatory" and unprofessional behavior toward the security guard. SOFs ¶ 96. The Plaintiff advised the Defendant Ronan that he had observed Marchese and McCormick imitating the speech, berating, intimidating and engaging in unprofessional behavior toward the security guard who the Plaintiff believed was disabled.

SOFs ¶ ¶ 76, 96. The Defendant Ronan responded to the Plaintiff's concerns in an agitated manner and informed the Plaintiff that he would look into the issue. SOFs ¶ 96. Yet the Plaintiff's employment was suspended two days later on or about September 9, 2010 and subsequently terminated. SOFs ¶ ¶ 105, 106. Given the foregoing, it is clear that the Plaintiff has complained of protected activity.

**2. <u>Adverse Action—Security Guard/Plaintiff</u>**

The Defendants go on to argue that the Plaintiff's claims are meritless because the security guard has suffered no adverse action. However, the Defendants' contentions are clearly misplaced. In the instant case, the question is whether the Plaintiff suffered an adverse action after he complained about what he reasonably believed to be wrongful discriminatory conduct and whether he acted reasonably in response to his belief. The real issue is not the specific nature of the security guard's impairment as known by the Plaintiff then or at the present time, or the specific diagnosis of the security guard's physical condition; rather, the focus should be on the Plaintiff's reasonable belief regarding the security guard's disability. The Plaintiff is only required to demonstrate that he reasonably believed that the Defendant Innovation was engaged in wrongful discrimination and to have acted reasonably in response to his belief. The Plaintiff's beliefs are certainly reasonable under the circumstances. Even the Plaintiff's former supervisor, Collamore, admitted the conduct toward the security guard was inappropriate and wrong. SOFs ¶ 85.

As is noted above, the security guard was an employee of Arrow Security who was sub-contracted by the Defendant Innovation to provide security services at its Springfield call center location. SOFs ¶ 76. The security guard worked at the direction of the supervisors and managers of the Defendant Innovation. SOFs ¶ 76.

The Plaintiff observed the security guard as having a speech impediment and maybe a hearing impediment, both amounting to what the Plaintiff believed to be a disability and a handicap. SOFs ¶ 76. The security guard's speech impediment, and perhaps hearing impairment, were obvious and significantly affected the security guard's ability to speak. SOFs ¶ 76. The security guard tended to speak in a slow and garbled manner, and often times the Plaintiff would have to ask her to repeat herself before he could fully understand what she was trying to communicate to him. SOFs ¶ 76.

The Plaintiff, on at least three occasions, witnessed his supervisors McCormick and Marchese engaging in discriminatory conduct against the security guard based upon her speech impediment. SOFs ¶ 78. On one occasion, in or about February or March, 2010, the Plaintiff witnessed Marchese standing on the Defendant Innovation's call center floor and announcing to the Defendant Innovation's administrative staff that he was going to yell at the security guard for not always being at her post. SOFs ¶ 79. Marchese did this to "elicit a humorous response" from the administrative staff. SOFs ¶ 79. Marchese also imitated the security guard's speech impediment in this instance as well. SOFs ¶ 79. Thereafter, the Plaintiff witnessed McCormick mimic the security guard's speech impediment on two occasions. SOFs ¶ 80. On one occasion, the security guard was speaking to McCormick, and as the security guard was walking away McCormick began a "guttural copy of her speech impediment" and then in her own voice said "I can't stand her." SOFs ¶ 81. A few weeks later on another occasion, the security guard was talking to McCormick, telling her that her computer was not working. SOFs ¶ 82. As the security guard was walking away, McCormick stated mockingly "my computer's not working, I'm so stupid I don't know what to do blah blah blah." SOFs ¶ 82. McCormick then said in her own voice that she "can't understand a damn thing [the security guard] says." SOFs ¶ 82. The

Plaintiff believes that there were at least a dozen witnesses in the Defendant Innovation's call center who witnessed this incident as McCormick was in full vision and hearing range. SOFs ¶ 82. McCormick's discriminatory and unprofessional comments were made while the security guard was within hearing range. SOFs ¶ 83.

In fact, Collamore, the Plaintiff's former supervisor, admitted in her deposition that in addition to McCormick, various employees of the Defendant Innovation, including Collamore, made inappropriate comments about the security guard's speech. SOFs ¶ 85. Collamore admitted that "[they] would just make fun of and mimic the way [the security guard] talked." SOFs ¶ 85. Collamore testified that she and other supervisors would make fun of the security guard to other managers and that it was possible the quality assurance representatives witnessed this behavior. SOFs ¶ 85. While Collamore was not sure exactly how many times she engaged in mimicking of the security guard, she agreed that it was not less than five times. SOFs ¶ 85. Furthermore, Collamore admitted that if someone like the Plaintiff heard this behavior and was offended by it, that it would not be good for morale and was negative. SOFs ¶ 85. Yet as of Collamore's voluntary separation of employment from the Defendant Innovation, no employee had been terminated or reprimanded for "mimicking" the security guard. SOFs ¶ 85.

As is noted above, the Plaintiff was upset and concerned about this discriminatory conduct and complained on several occasions to management from April of 2010 right up to just days before his termination of employment. SOFs ¶ 84. The Plaintiff, in good faith, believed that the Defendant was engaged in wrongful discriminatory practices when on several occasions his supervisors would ridicule the security guard within in her hearing distance and in front of other employees and to other employees. SOFs ¶ ¶ 78 - 83.

The Defendants attempt to downplay McCormick and Marchese's harassment of the security guard by stating that they simply mimicked her "voice." However, the security guard suffered from a speech impediment, which under particular circumstances has been considered a handicap by the courts. McInnis v. Alamo Community College Dist., 207 F.3d 276, 10 A.D. Cas. (BNA) (5th Cir. 2000)(defendant employer motion for summary judgment denied where court found ample evidence that plaintiff employee had been discriminated against based upon his speech impediment which substantially limited him in the major life activity of speaking). See also, Dudley v. Hannaford Bros. Co., 333 F.3d 299, 14 A.D. Cas. (BNA) 901 (1st Cir. 2003). Clearly, the impersonation and ridicule of another's handicap rises to the level of severe or pervasive where it occurs in front of an audience, happens on at least three occasions and is engaged in by supervisors. Either way, the Plaintiff observed what he reasonably believed to be wrongful discriminatory conduct and in good faith complained to management.

**B. The Plaintiff Can Establish A Causal Connection And Pretext.**

As is noted above, the causal connection may be established if the retaliatory acts are close in time to the Plaintiff's protected activity. Zimmerman v. Direct Federal Credit Union, 262 F. 3d 70, 80 – 85 (1st Cir. 2001). In this case, the protected activity occurred, most recently, with the newly hired Defendant Ronan and just two days before the Plaintiff's employment was suspended and subsequently terminated. SOFs ¶ ¶ 84, 95, 96. On September 7, 2010, the Plaintiff had a one-on-one meeting for approximately one and one-half hours with the Defendant Ronan. SOFs ¶ 95. The Plaintiff printed out his response to the Defendant Innovation's online survey and provided it to the Defendant Ronan during their one-on-one meeting. SOFs ¶ 95. The Plaintiff and the Defendant Ronan reviewed the Plaintiff's response to the Defendant Innovation's survey and discussed it point by point. SOFs ¶ 95. Specifically, the Plaintiff

expressed his concerns regarding his supervisors and managers discriminatory and unprofessional behavior toward a disabled security guard and his observations of various violations of HIPAA laws within the Defendant Innovation. SOFs ¶ 96. The Plaintiff also informed the Defendant Ronan that he would be submitting FMLA paperwork for his medical condition. SOFs ¶ 96. All of this activity occurred just days before the Plaintiff was suspended and subsequently terminated for false reasons – that he had a "negative attitude" – which the Plaintiff vehemently denies. SOFs ¶ ¶ 106 – 109.

## IV. MATERIAL FACTS IN DISPUTE EXIST AS TO PLAINTIFF'S FMLA – RELATED COUNTS.

The Plaintiff suffers from a medical condition known as segmental dysfunction of the cervical and lumbar regions of the spine. SOFs ¶ 110. The Plaintiff's medical condition began in or about 2005. SOFs ¶ 110. The Plaintiff also has problems with his hip which is interrelated to his back condition, according to his chiropractor Dr. Caprile. SOFs ¶ 110. If the Plaintiff does not receive treatment, then it is likely that the joints will degenerate – treatment stalls the degeneration process. SOFs ¶ 110. The Plaintiff would have significant debilitating pain if his medical condition were left untreated and could, ultimately, end up suffering from nerve damage as well. SOFs ¶ 110. The Plaintiff, with the exception of July through September, 2010, has received consistent treatment, averaging approximately four times per month since in or about 2005. SOFs ¶ 110. The Plaintiff was able to work but requested accommodations to not lift heavy objects, to go to his chiropractic appointments and to be able to get up from his work station and stretch and/or move around from time-to-time. SOFs ¶ 111. Due to the Plaintiff's chronic medical condition, Dr. Caprile has ordered semi-regular treatment for the Plaintiff as necessary to prevent premature degeneration of the Plaintiff's joints in his spine. SOFs ¶ 112.

The Plaintiff's medical condition is also prone acute flare-ups which require intermittent treatment in addition to his semi-regular visits. SOFs ¶ 112.

At the commencement of Lourdes Garcia's ("Garcia" hereinafter) position as the Plaintiff's supervisor, the Plaintiff advised Garcia that he had a prior arrangement with his former supervisor, Maureen Collamore ("Collamore" hereinafter) which allowed him to seek treatment with his chiropractor. SOFs ¶ 103. The Plaintiff also informed Garcia that this prior arrangement had also been approved by Gary Bashaw ("Bashaw" hereinafter), Call Center Manager for the Defendant Innovation. SOFs ¶ 103. Garcia then informed the Plaintiff that she had spoken to Bashaw and they could no longer allow the Plaintiff special treatment where other, non-handicapped employees of the Defendant were not allowed the same accommodations. SOFs ¶ 104. Garcia was very agitated at the Plaintiff's inquiry, and at this point the Plaintiff requested relief under the FMLA. SOFs ¶ 104.

Dr. Caprile completed the necessary FMLA paperwork on or about August 31, 2010. SOFs ¶ 105. The Plaintiff picked up the FMLA form from Dr. Caprile during his next appointment on or about September 8, 2010. SOFs ¶ 105. The following day, on or about September 9, 2010, the Plaintiff advised Garcia during their lunch hour that he had the FMLA forms, but having forgotten them in his vehicle would provide them to her later at the end of his work shift. SOFs ¶ 105. However, the Plaintiff's employment was subsequently suspended before the end of his work shift on or about September 9, 2010, and then the Plaintiff was terminated shortly thereafter on or about September 14, 2010. SOFs ¶ 105.

A. **<u>Plaintiff Was Covered Under FMLA Because He Had And Demonstrated That He Had A "Serious Health Condition" That Required Intermittent Leave To Receive Treatment From A "Health Care Provider".</u>**

i. **"<u>Serious Health Condition</u>"**

As the Defendant correctly states, a "serious health condition" is defined as "an illness, injury, impairment or physical condition that involves… continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B).

"Continuing treatment" is defined as follows:

> A serious health condition involving treatment by a health care provider <u>includes any one or more of the following</u>: (c) [c]hronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which: (1) requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2) continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) may cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.) or (e) [c]onditions requiring multiple treatments. Any period of absence to receive multiple treatments (including any recovery therefrom) by a health care provider or by a provider of helath care services under orders of, or on referral by a health care provider, for:…(2) [a] condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment…

29 C.F.R. 825 § 115 (c)(1)(2) and (3) and (e)(2).

The Plaintiff suffers from a medical condition, which began in or about 2005, known as subluxation and segmental dysfunction of the cervical and lumbar regions of the spine. SOFs ¶ 110. According to Dr. Caprile, the Plaintiff also has problems with his hip and jaw which are interrelated to his back condition. SOFs ¶ 110. According to Dr. Caprile, without treatment the Plaintiff's medical condition could lead to degeneration of the joints in his spine. However, continuing treatment is expected to postpone joint degeneration. The Plaintiff also risks the possibility of irreversible nerve damage if his medical condition were to be left untreated. SOFs

¶ 110. The Plaintiff would have significant debilitating pain if left untreated and could end up suffering from nerve damage as well. Id.

In or about 2005, Dr. Caprile took infrared scans of the Plaintiff's neck and spine. In or about 2006, Dr. Caprile also took x-rays of the Plaintiff's neck and spine with partial views of the hips on the anterior/posterior view. SOFs ¶ 113.

Due to the Plaintiff's chronic medical condition, Dr. Caprile has also ordered semi-regular treatment as necessary to prevent premature degeneration of the joints in Mr. Surprise's spine. SOFs ¶ 112. As is noted above, the Plaintiff's medical condition is also prone to acute flare-ups which require intermittent treatment in addition to his semi-regular visits. SOFs ¶ 112.

Given the foregoing, the Plaintiff has clearly illustrated that the suffered from a serious health condition as defined and that he qualified for intermittent treatment under the FMLA.

**ii. "Health Care Provider"**

"Health care provider" is defined as a chiropractor if the chiropractor is providing "treatment consisting of manual manipulation of the spine to correct subluxation as demonstrated by x-ray to exist." 29 C.F.R. § 825.125(b)(1). There are three necessary conditions for a chiropractor to be a FMLA "health care provider": (1) that he take an x-ray of the employee; (2) that the x-ray reveals a subluxation of the spine; and (3) that he treats the employee for that subluxation through manual manipulation of the spine. McDonald v. Mt. Perry Foods, Inc., 2011 U.S. Dist. LEXIS 84598 (2011).

On or about August 30, 2012, Dr. Caprile was deposed regarding Mr. Surprise's medical condition and treatment by counsel for the Defendants. SOFs ¶ 113. At the time, when asked by defense counsel if he had ever taken x-rays of the Plaintiff's spine, Dr. Caprile responded by stating that he had not. SOFs ¶ 113. However, due to the Plaintiff's extensive history of

treatment, Dr. Caprile had forgotten that he had, in fact, taken infrared scans and x-rays of the Plaintiff's neck and spine with partial views of the hips on the anterior/posterior view approximately six to seven years prior. SOFs ¶ 113.

Dr. Caprile has treated the Plaintiff with manual manipulation of the spine, semi-regularly since approximately 2005 and, in fact, diagnosed the Plaintiff's condition with x-rays and infrared lights in or about 2005/2006 at the commencement of his treatment. SOFs ¶ ¶ 110, 113. Therefore, it is clear that Dr. Caprile has satisfied the necessary elements to be considered a health care provider under the FMLA.

Contrary to the Defendants' assertions, the instant case is clearly distinguishable from Olsen as the Plaintiff has established a material issue of fact in dispute as to the severity of his medical condition as well as his treating chiropractor's fulfillment of the health care provider requirements. Olsen v. Ohio Edison Company, 979 F. Supp. 1159, U.S. Dist. LEXIS 15263 (1997). The Olsen Court found that the plaintiff's testimony was not sufficient to defeat summary judgment where he lacked, in addition to diagnostic x-rays, any hint of subluxation or manual manipulation of his spine in his medical records. Whereas, in Pinson v. Berkley Medical Resources, Inc., 2005 U.S. Dist. LEXIS 13045, the court found that the plaintiff's chiropractor notes relating to treatment and the chiropractor's testimony regarding his semi-regular treatment of the plaintiff, and the prognosis of the plaintiff's condition, were sufficient to establish a material issue of fact regarding the plaintiff's medical condition. See also Davison v. Roadway Express, Inc., 562 F. Supp. 2d 971, 981 (2008)("The evidence here is significantly greater than the evidence presented in Olsen and constitutes enough of a genuine issue of material fact to survive summary judgment"). [1]

---

[1] In further support of their argument, the Defendants cite to the case of Silcox v. Via Christi Okla. Reg'l Med. Ctr., 196 F. App'x 658 (10th Cir. 2006)(plaintiff's treating chiropractor is not a health care provider where diagnostic x-

In the instant case, the Plaintiff has presented substantial evidence regarding the severity of his medical condition, subluxation and segmental dysfunction of the cervical and lumbar regions of the spine, evidencing semi-regular manual manipulations of the spine, dating back to 2005. The diagnostic measures (x-rays) taken by Dr. Caprile, as well as notes issued to the Defendant Innovation from Dr. Caprile indicating the need for continued treatment and medical records from Dr. Caprile documenting the Plaintiff's treatment also support the severity of the Plaintiff's medical condition. SOFs ¶ ¶ 110, 112, 113. It is clear that the Plaintiff, in addition to fulfilling the requirements as outlined under the FMLA, has established a material facts in dispute regarding same.

**B. Plaintiff's FMLA Interference Claims**

In order for a plaintiff to succeed on an FMLA interference claim, he must prove the following elements by preponderance of the evidence: (1) that he was eligible for FMLA as an employee of the Defendant Innovation; (2) that the Defendant Innovation was a covered employer under the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he gave the Defendant Innovation had notice of his need to take FMLA; and (5) the Defendant Innovation used the FMLA against the Plaintiff in an unlawful manner. McDonald v. Mt. Perry Foods, Inc., 2011 U.S. Dist. LEXIS 84598 (2011)(internal citations omitted).

To qualify for leave under the FMLA, an employee must have been employed by an employer for at least one year and have completed at least 1,250 working hours. 29 U.S.C.S. § 2611(2)(A)(i)(ii). The Plaintiff was hired by the Defendant Innovation in or about November, 2007 as a customer service representative ("CSR"). SOFs ¶ 70. Thereafter, the Plaintiff was promoted to the Quality Assurance Department. SOFs ¶ 71. The Plaintiff, in the Quality

---

rays were not taken). However, as stated above, Dr. Caprile did, in fact, diagnose the Plaintiff's serious health condition with x-rays; therefore, the instant case is distinguishable from Silcox as well.

Assurance Department, held a middle management position and began working a full-time schedule, five days a week on average, working one Saturday per month and one night per week. SOFs ¶ ¶ 71, 72. Sometimes, such as during the BP oil spill, the Plaintiff would work approximately fifty to sixty hours per week. SOFs ¶ 71. An employer is required to offer FMLA to its employees when it employs greater than fifty employees. 42 U.S.C.S. § 2612(4)(A)(i). The Defendant Innovation employs approximately 200 plus employees at its Springfield, Massachusetts Call Center location. SOFs ¶ 71. The Plaintiff, as discussed in more detail above, suffered from a serious health condition which required continuing treatment from a health care provider. SOFs ¶ ¶ 110 - 113.

Garcia took over the position of the Plaintiff's supervisor in or about June, 2010. SOFs ¶ 103. At the commencement of Garcia's position as the Plaintiff's supervisor, the Plaintiff advised Garcia that he had a prior arrangement with his former supervisor, Collamore which allowed him to seek treatment with his chiropractor. SOFs ¶ 103. Garcia informed the Plaintiff that she had spoken to Bashaw and they could no longer allow the Plaintiff special treatment where other, non-handicapped, employees of the Defendant Innovation were not allowed the same accommodations. SOFs ¶ 104. Garcia was very agitated at the Plaintiff's inquiry and at this point the Plaintiff requested the necessary documentation to seek relief under the FMLA. SOFs ¶ 104.

Dr. Caprile completed the FMLA paperwork on or about August 31, 2010. SOFs ¶ 105. The Plaintiff picked up the FMLA documentation from Dr. Caprile during his next appointment on or about September 8, 2010. SOFs ¶ 105. The following day, on or about September 9, 2010, the Plaintiff advised Garcia during their lunch hour that he had the FMLA forms, but having forgotten them in his vehicle, he would provide them to her later at the end of his work shift.

SOFs ¶ 105. However, the Plaintiff's employment was subsequently suspended before the end of his work shift on or about September 9, 2010. SOFs ¶ 105.

## C. Plaintiff's FMLA Retaliation Claims

The *prima facie* burden of a plaintiff on an FMLA retaliation claim requires that he show that: (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse action. Lukacinsky v. Panasonic Service Company and Ted Kent, 2004 U.S. Dist. LEXIS 25846. As is further discussed below, the Plaintiff can establish that the Defendants retaliated against him for his exercising his rights under the FMLA.

To succeed on a retaliation claim, a plaintiff must prove that he engaged in protected activity; he suffered an adverse employment action; and a causal connection exists between the two. Mole v. University of Massachusetts, 58 Mass. App. Ct. 29 (2003). This causal connection may be established if the alleged retaliatory acts are close in time to the plaintiff's protected activity. Id. at 39. Under this standard, retaliation claims succeed even though the underlying claims of discrimination fail. See, e.g., Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 80–85 (1st Cir. 2001).

As with a claim for discrimination, a plaintiff alleging workplace retaliation must prove, among other things, that he suffered an "adverse employment action" on account of a protected activity. However, "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern, 548 U.S. at 64, 126 S.Ct. 2405; *see also* Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008)("[C]onduct need not relate to the terms or conditions of employment to give rise to a retaliation claim."). Rather, a plaintiff may satisfy this requirement by showing that "a

reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern, 548 U.S. at 64, 126 S.Ct. 2405.

Dr. Caprile completed the FMLA paperwork on or about August 31, 2010. SOFs ¶ 105. The Plaintiff picked up the FMLA form from Dr. Caprile during his next appointment on or about September 8, 2010. SOFs ¶ 105. The following day, on or about September 9, 2010, the Plaintiff advised Garcia during their lunch hour that he had the FMLA forms but having forgotten them in his vehicle would provide them to her later at the end of his work shift. SOFs ¶ 105. However, the Plaintiff's employment was subsequently suspended before the end of his work shift on or about September 9, 2010. SOFs ¶ 105.

The Plaintiff was terminated while engaging in the FMLA process. SOFs ¶ 105. His supervisors were clearly agitated with his FMLA request. SOFs ¶ ¶ 96, 104. Therefore, there is sufficient evidence of a casual connection for a jury to decide the Plaintiff's FMLA claims.

## V. FIRST NOTICE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S HIPAA – BASED CLAIM THAT HIS EMPLOYMENT WAS TERMINATED IN VIOLATION OF PUBLIC POLICY.

### A. Plaintiff can establish a well defined public policy is at issue.

The Plaintiff submits evidence that he was terminated shortly after objecting to violations of the Health Insurance Portability and Accountability Act ("HIPAA"). Termination of an employee for resisting illegal action in the performance of his or her employment duties violates public policy, especially where that public policy exists to protect the public safety and/or welfare. DeRose v. Putnam Management Co., 398 Mass. 205, 210 (1986) (holding that "an at-will employee has a cause of action for wrongful discharge if the discharge is contrary to public policy.") Generally, there must be a statutory basis for any public policy that will support a

cause of action. *See* Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469 (1992). For example, a wrongful discharge claim in violation of public policy may lie where an employee is terminated for enforcing safety laws that it is the employee's responsibility to enforce. Hobson v. McLean Hosp. Corp., 402 Mass. 413, 416 (1988).

The public policy at issue in this case arises out of protection of the public safety and welfare. Pursuant to 42 U.S.C.S. § 1320d, the Defendant Innovation is considered a health care clearing house which is defined as a "public or private entity that processes or facilitates the processing of nonstandard data elements of health information into standard data elements." 42 U.S.C.S. § 1320d(2). SOFs ¶ 89. As a health care clearing house, the Defendant Innovation is responsible for possessing "policies and security procedures which isolate the activities of the health care clearing house with respect to processing information in a manner that prevents unauthorized access to such information by such larger organization." 42 U.S.C.S. § 1320d-2(B). As well as

> (2) Safeguards. Each person described in this section 1172(a) [42 U.S.C.S. §1320d-1] who maintains or transmits health information shall maintain reasonable and appropriate administrative, technical and physical safeguards:
> (A) to ensure the integrity and confidentiality of the information;
> (B) to protect against any reasonably anticipated –
> (i) threats or hazards to the security or integrity of the information; and
> (ii) unauthorized uses or disclosures of the information; and
> (C) otherwise to ensure compliance with this part [42 U.S.C.S. §§ 1320d et seq.] by the officers and employees of each person.
>
> 42 U.S.C.S. § 1320-d (d)(2) (internal citations omitted).

Furthermore, criminal proceedings for violations of HIPPA are authorized. 42 U.S.C.S. §1320d-6.

The Plaintiff witnessed customer service representatives improperly disposing of private health information, consisting of written documents, into trash receptacles. SOFs ¶ 90. The

Plaintiff advised the customer service representatives to dig the written documents out of the trash and to place them in the proper bin. SOFs ¶ 90. The Plaintiff's former supervisors Collamore and Garcia agreed that throwing medical documentation in the trash is inappropriate and a serious HIPAA violation. SOFs ¶ 87. Garcia testified that an employee caught throwing medical documentation in the trash would be written up. SOFs ¶ 87. Cell phone use on the floor can also lead to HIPAA violations. SOFs ¶ 88.

The Plaintiff first complained of HIPAA violations during a Quality Assurance Department meeting in or about April, 2010. SOFs ¶ ¶ 92, 93. The Plaintiff addressed his concerns regarding HIPAA violations to Bashaw, who responded by stating that he was aware of HIPAA violations. SOFs ¶ 91. Yet Bashaw never did anything to correct the HIPAA violations. SOFs ¶ 91. The Plaintiff also complained in or about August, 2010 in his response to the Defendant Innovation's anonymous online survey. SOFs ¶ 94.

On September 7, 2010, the Plaintiff had a one-on-one meeting for approximately one and one half hours with the Defendant Ronan. SOFs ¶ 95. The Plaintiff wanted to meet with the Defendant Ronan because he felt there were major issues that needed to be addressed and he felt that it was possible that the Defendant Ronan (having heard from other employees that he had an open door policy and was asking about issues that needed changing) might address some of the issues that he (the Plaintiff) was concerned about. SOFs ¶ 95. The Plaintiff printed out his response to the Defendant Innovation's online survey and provided it to the Defendant Ronan during their one-on-one meeting. SOFs ¶ 95. The Plaintiff and the Defendant Ronan reviewed the Plaintiff's response to the Defendant Innovation's survey and discussed it point by point. SOFs ¶ 95. During this meeting, the Plaintiff expressed his concerns regarding his observations of various violations of HIPAA laws within the Defendant Innovation. SOFs ¶ 96. The Plaintiff

described the improper disposal of private health documentation with the Defendant Ronan. SOFs ¶ 96. The Plaintiff also complained about the use of cell phones on the call center floor. SOFs ¶ 96. Mr. Ronan responded with anger at the Plaintiff regarding the HIPAA violations and responded that he would have to look into it. SOFs ¶ 96.

The Plaintiff's complaints were about violating HIPAA, which are not merely internal policies as the Defendants allege. Nonetheless, the public policy exception may be applicable even where the employee's reports or complaints are only internal to the company. Internal complaints that relate to violations of criminal law or conduct that jeopardizes the public safety or welfare may be sufficient. Shea v. Emmanuel Coll., 425 Mass. 761, 762-763 (1997) (an employee who is terminated after reporting unlawful conduct to management may bring a claim for wrongful discharge in violation of public policy). *See* Smith v. Mitre Corp. 949 F. Supp. 943, 950 (D. Mass. 1997) (plaintiff need not have complained outside the organization to claim the public policy exception).

In Falcon v. Leger, an employee refused to interfere with a product inspection process conducted by a private, independent testing laboratory upon which government inspectors rely to insure the safety of the public. Falcon v. Leger, 62 Mass. App. Ct. 352, 353 (2004), *further appellate review denied*, 443 Mass. 1102 (2004). Falcon, the employee, objected to his supervisor's instruction to deceive a UL safety inspector by shipping items known to be rejected by the inspector, as well as the supervisor's instruction to deceive the inspector regarding the items used in manufacturing. *Id.* at 359. After Falcon made his objections, he did follow his supervisor's instruction to illegally label defective wire with UL labels and ship it to the customer. *Id.* Yet, at the close of his shift, Falcon was terminated, and the reason given was that he had allegedly requested a pay raise in a threatening manner on that same day. *Id.*

The Appeals Court held that the evidence supported the conclusion that Falcon was discouraged, both explicitly from his supervisor and implicitly through the threat of discharge, from reporting suspected UL violations that had the potential to affect the safety of the population at large. Falcon, 62 Mass. App. Ct. at 364. Notably, the Appeals Court found that Falcon presented ample evidence that his supervisor's conduct, although possibly not "illegal," as Falcon may have believed, nevertheless presented a threat to the public safety and was otherwise unlawful. *Id.* at 365.

While the Court in Falcon found that the supervisor's conduct may not have been illegal, here, in the case at bar, the conduct complained about by the Plaintiff was clearly in violation of HIPPA. While in Falcon the time between the employee's objections and his termination was brief (*i.e.*, the same day), in the instant case, the time lapse was also relatively brief (*i.e.*, just days). In Falcon, the employee ultimately did perform the objectionable task imposed on him by his supervisor, and yet the Appeals Court found sufficient evidence of a violation of public policy. Falcon, 62 Mass. App. Ct. at 358.

## CONCLUSION

For all of the foregoing reasons, the Plaintiff respectfully requests that the Court deny the Defendants' Motion for Summary Judgment in its entirety and allow a jury to decide his claims about which there remain factual issues in dispute.

Respectfully Submitted,

The Plaintiff
ANDREW SURPRISE
By His Attorney

/s/ Michael O. Shea
MICHAEL O. SHEA, ESQ.
BBO No. 555474
Law Office of Michael O. Shea, P.C.
3 Crane Park Drive, Suite 7
Wilbraham, MA 01095
Telephone: (413) 596-8005
Facsimile: (413) 596-8095

Dated: November 5, 2012

REQUEST FOR ORAL ARGUMENT

The Plaintiff hereby requests an oral argument on *Defendants' Motion for Summary Judgment* and *Plaintiff's Opposition to Defendants' Motion for Summary Judgment.*

/s/ Michael O. Shea
Michael O. Shea

CERTIFICATE OF SERVICE

I, Michael O. Shea, Esq., hereby certify that on this 5th day of November, 2012, I served the foregoing document by electronic filing through the ECF system to Counsel of Record for the Defendants.

/s/ Michael O. Shea
Michael O. Shea