## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                           )
**ANDREW SURPRISE,**                       )
                                           )
    **Plaintiff,**                         )
                                           )    **Civil Action No.**
    **v.**                                 )    **11-30181-FDS**
                                           )
**THE INNOVATION GROUP, INC. / FIRST** )
**NOTICE SYSTEMS, INC., and**              )
**TERRY RONAN,**                           )
                                           )
    **Defendants.**                        )
                                           )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

This is an action for an alleged unlawful termination of a call-center employee. Plaintiff

Andrew Surprise alleges that his former employer, the Innovation Group, Inc. / First Notice

Systems, Inc. (collectively, "First Notice") terminated his employment for reasons that violated

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, the Americans Family

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et. seq.*, and Massachusetts law.

The complaint contains eight counts and names two defendants, First Notice and Terry

Ronan. Defendants have moved for summary judgment on all counts. In response, plaintiff

voluntarily dismissed two counts based on his claim of disability discrimination (Counts I and

III), but contests summary judgment on the remaining claims.

For the reasons set forth below, the defendants' motion for summary judgment will be

granted in part and denied in part.

# I.      Background

## A.      Factual Background

Andrew Surprise began working for First Notice at its Springfield, Massachusetts call-center in 2007.  Surprise began as a customer-service representative, but was promoted to quality-assurance associate in 2009.  As a quality-assurance associate, he was responsible for monitoring calls, coaching customer-service representatives, and occasionally supervising temporary employees on special projects.  When the call center was understaffed for the volume of calls coming in, quality-assurance associates were also required to answer telephones.  During the time Surprise was a quality-assurance associate, he was frequently required to answer phones because of understaffing, which he complained about on multiple occasions.

Robert Caprile, a chiropractor, examined Surprise in approximately 2005 and diagnosed subluxation of the cervical and lumbar regions of his spine.[1]  Since that time, he has been receiving treatment from Caprile.  Caprile took x-rays of Surprise's neck and spine on February 23, 2006.[2]

Surprise's first direct supervisor in the quality-assurance group was Maureen Collamore.  Collamore permitted Surprise to leave during his work shift and/or arrive late to work in order to receive treatments from Caprile.  Surprise never applied for FMLA leave while under her

---

[1] Subluxation, in the context of chiropractic care, is a biomechanical lesion or dysfunction in a joint or motion segment.

[2] The x-ray images are the subject of a motion to strike by defendants.  The x-ray images were not produced in discovery, but were instead simply submitted as an attachment to plaintiff's opposition to summary judgment.  They were not initially authenticated, although a subsequent affidavit from Caprile purports to authenticate the copies filed with the Court.  In his deposition Caprile previously testified that he had not ever taken x-rays of plaintiff's spine.  Caprile avers that he had forgotten about the x-rays now offered.  Because the Court will grant summary judgment as to the plaintiff's FMLA interference claim, and the existence of the x-rays is not dispositive on summary judgment as to the plaintiff's FMLA retaliation claim, the Court will deny the motion to strike as moot.

supervision.  Collamore also issued verbal warnings to Surprise about his tardiness on several

occasions; on at least some of those occasions, he blamed his tardiness on traffic.

In June 2010, Lourdes Garcia replaced Collamore as Surprise's supervisor.  Garcia did

not permit Surprise to arrive late or leave work to visit Caprile.  Nonetheless, Surprise still

managed to visit Caprile with the same relative frequency during non-working hours.

According to Surprise, on at least five occasions between February and April 2010 he

witnessed call-center managers Vera McCormick and John Marchese making unprofessional and

discriminatory comments about a security guard.[3]  The incidents occurred on the call-center floor

in front of subordinates.  The guard was missing teeth and may have had a speech impediment;

according to Surprise, McCormick and Marchese mockingly imitated her voice, used foul

language, and inappropriately yelled at her.  In a quality-assurance group meeting in April 2010,

Surprise notified everyone present, including department manager Gary Bashaw, that he

believed the security guard had been subjected to discriminatory treatment on the basis of her

speech impediment.

Surprise also contends that he witnessed customer-service representatives improperly

disposing of private health information in regular waste bins, allegedly in violation of HIPAA.

On a number of occasions, including the April 2010 meeting discussed above, Surprise informed

Bashaw of these actions.  Bashaw had developed First Notice's HIPAA compliance program,

which included an internal policy requiring the shredding of any document that contained

HIPAA-protected information.  According to Surprise, Bashaw acknowledged that HIPAA

violations were occurring, but took no action.  Surprise never produced any of the materials that

---

[3] The security guard was an employee of Arrow Security, but took directions from the supervisory staff of First Notice.

3

he alleged had been improperly discarded for Bashaw to investigate the matter further.

In August 2010, First Notice solicited comments from its employees through an anonymous online survey.  Surprise responded to the survey and e-mailed a copy of his response to his personal e-mail account.  In his response, Surprise complained, among other things, about the fact that he was required to answer phones, the mistreatment of the security guard, and the alleged HIPAA violations.

In September 2010, First Notice hired Terry Ronan as a senior vice-president to improve the company's performance.  At the time, the company was unprofitable and had declining revenues, high turnover, and low morale.  Upon joining the company, Ronan set about meeting with supervisors at the call center one-on-one to help him assess the situation and decide what changes needed to be made.  On September 7, Surprise requested a meeting with Ronan.  Ronan obliged, and the two discussed a number of issues.  Surprise contends that he handed Ronan a copy of his response to the anonymous survey, and that they discussed each issue raised in that document.  According to Surprise, he also complained to Ronan about not getting time off for his chiropractic treatment and informed him that he would be applying for FMLA leave.  Surprise contends that in response to these complaints, Ronan became agitated.  Ronan told Surprise that there would be a meeting with the entire quality-assurance team the next day.

Upon leaving the meeting with Ronan, Surprise initiated a conversation by text message with a colleague, Michael Cecchetelli, who had not come in to work that day.  The conversation proceeded as follows (errors in original):

| | |
|---|---|
| Surprise: | I got QA a meeting with Terry Roman tomorrow at 1PM, so you should come in. |
| Cecchetelli: | Howd you do that [?] I'll def be there |
| Surprise: | I just went in and talked to him for about an hour and a half |

4

| Cecchetelli: | Holy shit. . .  What did he have to say about everything[?] |
| Surprise: | Major changed talked about merging the supervisor/qa positions |
| Cecchetelli: | How would that affect us? |
| Surprise: | We would be sups |
| Cecchetelli: | That would be nice, I def wouldn't mind that. . . Does it sound like he's for      real or just talk[?] |
| Surprise: | He gave me a few products to work on.  Projects I mean |
| Cecchetelli: | Did u talk to him about getting us off the phone?  He gave u a few what? |
| Surprise: | Projects to work on for client services, and I'm sitting in on a client meeting next week |
| Cecchetelli: | Good shit, I hope this guy is the real deal. . . |
| Surprise: | I think so |
| Cecchetelli: | I'm coming to get shayla now ill stop in and see u |
| Surprise: | Ok |

(Def. Opp. at Ex. BB).

After receiving those text messages, Cecchetelli contacted department manager Gary Bashaw and told him about Surprise's meeting with Ronan.  Cecchetelli also told Bashaw that Ronan wanted to meet with the whole quality-assurance department the next day and that he was planning significant changes.  Bashaw became irritated when he heard the news.  Bashaw called Ronan demanding answers and stating that any changes in his department should be discussed with him first.  Bashaw also expressed concern about Surprise communicating to other employees statements supposedly made by Ronan.  Ronan was not pleased with the call and disavowed the comments Surprise had reportedly attributed to him.

The next day, September 8, a number of quality-assurance employees came to Bashaw and reported hearing rumors, originating from Surprise, of "significant changes" that were in the works.  One such employee, Manuel Pineiro, sent an e-mail to Garcia, his supervisor, expressing frustration with the "negativity" of some of Surprise's comments from the day before (and at earlier times).  The e-mail also expressed frustration with Surprise's repeated complaints and general attitude.  Pineiro then approached Ronan to request a meeting and briefly relayed some

of these concerns orally to him.

In response to the stir that had been generated by the rumors circulating around the office, Ronan became more irritated with Surprise. Ronan related the events as he understood them, particularly the circulation of the rumors about significant changes, to Heather Monson, the human-resources manager. He inquired as to Surprise's personnel file and whether there were grounds to terminate him. After reviewing Surprise's file, Monson told Ronan that considering the circumstances, Surprise could be terminated for "negativity" in the workplace pursuant to First Notice policy. Ronan also asked Bashaw for his opinion on Surprise's continued employment; Bashaw responded that he thought Surprise's recent actions constituted insubordination and would support his termination.

Ronan decided to terminate Surprise. Because, however, the human-resources department needed a few days to process his final paycheck, Ronan decided to suspend him until that process was completed.

September 9 was the next day Surprise was scheduled to work. According to him, he arrived that day with the intention of requesting FMLA leave. He told his supervisor, Garcia, that he had his completed FMLA forms in his car, and that he would turn them into her at the end of his shift. Before his shift ended, however, Ronan met with Surprise and told him that he was suspended. He also gave him a copy of a workplace negativity memorandum that had been circulated earlier in the year.

Again, Surprise initiated a text-message conversation with Cecchetelli. In that conversation, Surprise asked Cecchetelli to "keep [his] ear to the ground" and to speak favorably on his behalf to Ronan. Surprise also asked for help in contacting their coworkers "Kristin,

Shelly, and Jeanette," who presumably also would support Surprise.

Surprise was ultimately terminated on September 14, 2010.

### B.     Procedural History

In June 2011, Surprise initiated this lawsuit against First Notice and Terry Ronan.  The complaint set forth seven claims against defendant First Notice:  (1) disability discrimination in violation of the ADA; (2) retaliation for reporting discrimination in violation of the ADA; (3) disability discrimination in violation of Mass. Gen. Laws ch. 151B; (4) retaliation for reporting discrimination in violation of Mass. Gen. Laws ch. 151B; (5) refusal to grant leave as required by the FMLA; (6) retaliation for request for leave under the FMLA; (7) wrongful termination in violation of public policy.  The complaint also raised one claim against defendant Ronan for retaliation under Mass. Gen. Laws ch. 151B.

On October 8, 2012, First Notice and Ronan jointly moved for summary judgment on all claims.  Surprise subsequently agreed to dismiss Counts 1 and 3, the claims based on his own alleged disability (as opposed to the disability of the security guard).

## II.    Analysis

### A.     Standard of Review

#### 1.     Summary Judgment

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation omitted).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### 2.     Burden-Shifting Framework for Retaliation Claims

Where, as here, there is no direct evidence of retaliation, a plaintiff may employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Coluburn v. Parker Hannifin/Nicholas Portland Div.*, 429 F.3d 325, 335 (1st Cir. 2005). Under this framework, the plaintiff must first establish a *prima facie* case of retaliation. *Id.* Once the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 336. If the employer articulates such a reason, the burden shifts back to the employee to show that the employer's stated reason for the adverse action was in fact a pretext for retaliation. *Id.*

### B.     ADA Claims

Count 2 alleges a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, and Count 4 alleges a violation of its state law analogue, Mass. Gen. Laws ch. 151B, § 4.[4]

---

[4] Massachusetts discrimination laws are very similar to the ADA, and are generally afforded the same construction as the federal law. *See Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (Mass. 1997). Therefore, with respect to these claims, the Court will generally discuss federal law, and will address Massachusetts law only to the extent that it differs from federal law.

The anti-retaliation provision of the ADA prohibits employers from taking adverse employment action against an individual "because such individual has opposed any act or practice made unlawful by this chapter . . . ." 42 U.S.C. § 12203(a).  Under the ADA, a plaintiff need not succeed on a disability-discrimination claim in order to assert a claim for retaliation. *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011).  Rather, to establish a *prima facie* case of retaliation, plaintiff must establish that (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.  *See Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004) (citing *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002)).

### 1.    *Prima Facie* Case

#### a.    Protected Conduct

The first requirement of a *prima facie* case of retaliation is proof that the plaintiff engaged in protected conduct.  For a plaintiff to prove that he engaged in protected conduct, he "need not establish that the conduct he opposed was in fact a violation of the [ADA]," only that he possessed a "good faith, reasonable belief that the underlying employment practice was unlawful." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 291 (S.D.N.Y. 1999) (Sotamayor, J.) (citing *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590 (2d Cir. 1988).  As a general matter, reporting discriminatory actions made against a disabled coworker amounts to "protected conduct" because it is "oppos[ing] any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a); *accord  Crawford v. Metro. Gov't*, 555 U.S. 271, 276 (2009) (holding that the term "oppose," in Title VII, carries its ordinary meaning,

9

which includes "to resist or antagonize . . . ; to contend against; to confront; resist; withstand," or "to be hostile or adverse to, as in opinion.") (internal quotations omitted).

Plaintiff contends that he engaged in protected conduct when he reported the allegedly discriminatory treatment of a speech-impaired security guard by call-center managers. The specific instances complained of included insulting and mocking comments made to call-center employees outside the presence of the security guard herself.  However, at least one alleged incident, in which Marchese aggressively and publicly reprimanded the security guard for his own amusement, involved a direct action taken against the disabled employee.

In order to show that he had a reasonable belief that the treatment of this security guard was unlawful, plaintiff must show that he had a reasonable belief that she was disabled, as defined by the ADA.  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Regulations promulgated under the ADA define a "physical or mental impairment" as "(1) [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as . . . respiratory (including speech organs)."  29 C.F.R. § 1630.2 (2011).  The regulations also define "major life activities" to include "speaking . . . communicating, interacting with others, and working."  *Id.*

There is undisputed evidence in the record that the security guard spoke in an unusual manner and was missing some teeth.  Plaintiff has also put forth evidence that the guard's speech was garbled and difficult to understand.  He testified that he, and others, understood her to have a speech impediment.  Defendants contend that her unusual manner of speaking did not rise to the

level of a speech impediment.  There is thus a dispute concerning that material issue of fact.  The

Court finds that a reasonable juror could conclude from the evidence that the plaintiff could have

reasonably believed that the security guard was "disabled" within the meaning of the ADA due

to physical impairment.

Plaintiff also must show that he had a reasonable belief that the treatment of the security

guard by call-center managers rose to a level of "discrimination" as defined by the ADA or

Massachusetts law.  The First Circuit has yet to decide whether claims of a hostile work

environment based on harassment are actionable under the ADA.  However, the Fourth, Fifth,

Seventh, Eighth, and Tenth Circuits have all recognized such claims as actionable. *See Lanman*

*v. Johnson County*, 393 F.3d 1151, 1154-55 (10th Cir. 2004) (citing cases); *Fox v. GMC*, 247

F.3d 169, 176-77 (4th Cir. 2001) (citing cases).  It is also well-established that such claims are

actionable under Mass. Gen. Laws ch. 151B.  *See Thompson v. Coca-Cola Co.*, 522 F.3d 168,

180 (1st Cir. 2009) (quoting *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 532

(2001) (further citation omitted)).  Accordingly, this Court will treat such a claim as actionable

under both the ADA and Massachusetts law.  Under both the Massachusetts standard and the

standard articulated by the Fourth Circuit for such claims, harassment is actionable if it was (1)

based on the individual's disability and (2) sufficiently severe or pervasive to alter a material

term, condition, or privilege of employment.  *See GMC*, 247 F.3d at 177; *accord Thompson*, 522

F.3d at 180.

The incidents that formed the basis for plaintiff's complaints of discrimination occurred

on at least five occasions over a three-month period.  Plaintiff has put forth evidence that the

security guard was mistreated based on her perceived disability—that is, her speech impediment.

The record indicates that only one of these five incidents directly involved the security guard herself.  However, that incident did result in her being publicly humiliated, allegedly for the call-center manager's amusement.  A reasonable juror could conclude that plaintiff could have reasonably believed that the security guard was subject to a hostile work environment on the basis of her disability.  Accordingly, plaintiff's complaints could reasonably be found to constitute protected activity under the ADA and Mass. Gen. Laws ch. 151B.

### b.    Adverse Employment Action

The second requirement of a *prima facie* case of retaliation is proof that the plaintiff suffered an adverse employment action.  There is no dispute that plaintiff was terminated, and that termination is an adverse action.

### c.    Causation

The third requirement of a *prima facie* case of retaliation is proof that there was a causal connection between plaintiff's termination and his engaging in protected conduct.

Plaintiff contends that the temporal proximity of his communication of his complaints to Ronan (at the September 7 meeting) to his suspension (on September 9) and termination (on September 14) is sufficient to establish the causation element.  *Calero-Cerezo*, 355 F.3d at 25 (finding that "sufficient temporal proximity between the protected conduct and the employment action . . . [makes] out a prima facie case"); *but see Wright*, 352 F.3d 478 (stating that "chronological proximity does not by itself establish causality").  *See also Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) ("close temporal proximity between two events may give rise to an inference of causal connection.").  Taking into account the extremely close temporal proximity in this case, the Court concludes that plaintiff has made out a *prima*

*facie* case of retaliation.

### 2. Legitimate Nondiscriminatory Reason

The burden thus shifts to defendants to offer a legitimate, nondiscriminatory reason for terminating plaintiff. *Wright*, 352 F.3d at 478. Here, defendants contend that plaintiff was terminated for "negativity" in the workplace, primarily stemming from his dissemination of rumors that employees would be fired by Ronan. Under the circumstances, defendants have offered proof of a legitimate, nondiscriminatory reason for the termination.

### 3. Pretext

The final step of the analysis requires plaintiff to offer proof of pretext: " . . . the plaintiff retains the ultimate burden of showing that the employer's stated reason for [the challenged actions] was in fact a pretext for retaliating." *Billings v. Town of Grafton*, 515 F.3d 39, 55 (1st Cir. 2008) (quoting *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 336 (1st Cir. 2005)). "One way to show pretext is through 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without the additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons.'" *Billings*, 515 F.3d at 55 -56 (alteration in original) (quoting *Hodgens*, 144 F.3d at 161).

Plaintiff contends that defendants' proffered reason is pretextual because the text messages he sent to his coworker following his meeting with Ronan and the resultant reaction at work cannot reasonably be interpreted as "negative." The content of those messages is undisputed. However, it is not the precise content of the messages that ultimately led to

plaintiff's termination; it is undisputed that Ronan did not have access to them when he made his decision to terminate plaintiff.  The issue, rather, is the reaction of the call-center employees in the days after plaintiff's meeting with Ronan, and the fact that multiple employees reported hearing rumors originating from Surprise.  It is also undisputed that both Ronan and Bashaw became angry with Surprise after the meeting and considered him responsible for the rumors.

Plaintiff contends, however, that the disruption at the office, if any, was minor and did not amount to "workplace negativity" warranting his termination.  But such decisions are for supervisors, not federal courts, to make, absent evidence of an improper motive.  The more difficult question is whether any such motive evidence exists.  Plaintiff offers practically no affirmative evidence, other than the close temporal proximity, to suggest that his termination was somehow related to his protected complaint.

There is certainly a strong argument to be made that this evidence is insufficient as a matter of law.  The problem, however, is that "negativity" is a term that could be used to describe a number of plaintiff's actions—including making protected complaints.[5]  In other words, plaintiff has put forth evidence—scant though it may be—that he made a protected complaint, and shortly thereafter was fired for "negativity."  Under the circumstances, the Court cannot grant summary judgment for defendants.

---

[5] This situation may present a so-called "mixed-motive" case.  A "mixed-motive" instruction may be warranted where sufficient evidence is presented that an employer considered both a proscribed factor (in this case, a complaint about disability discrimination) and one or more legitimate factors (in this case, the creation of disruptive rumors) in making an adverse employment decision.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (interpreting the standard for a mixed-motive instruction in Title VII cases); *see also Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 n. 3 (1st Cir. 2005).  Under such a framework, if the evidence could lead a reasonable juror to conclude that plaintiff's ADA complaints were a "motivating factor" (that is, but-for cause) of his termination, then the mixed-motive instruction may be given.  *Accord Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009) (holding that a plaintiff bringing an ADEA disparate-treatment claim must prove that age was the but-for cause of the challenged adverse employment action.).

It is certainly true that the evidence of discrimination is slight; indeed, the claim hangs by the slenderest of threads.  It is also true that there is an inherent danger that a bad employee will begin to make complaints of discrimination in order to intimidate the employer and prevent his or her termination.  Nonetheless, in the circumstances here, a reasonable juror could conclude that the proffered reason for plaintiff's termination was pretextual.

Accordingly, the Court will deny summary judgment as to plaintiff's claims for retaliation under the ADA and Mass. Gen. Laws ch. 151B.

### C.    FMLA Claims

The complaint contains two counts alleging violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*.  The FMLA contains two distinct type of rights, "prescriptive" rights and "proscriptive" rights.  *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159-60 (1st Cir. 1998).

First, the statute creates a series of substantive rights.  Among other things, eligible employees "shall be entitled" to up to twelve workweeks of unpaid leave, either continuous or intermittent, per year when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position."  *See* 29 U.S.C. § 2612(a)(1) & (b); 29 C.F.R. § 825.117.  The employee is also "entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority." *Hodgens*, 144 F.3d at 159 (*citing* 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100(c)).  According to the First Circuit, "[t]hese rights are essentially prescriptive, 'set[ting] substantive floors' for conduct by employers, and creating 'entitlements' for employees." *Hodgens*, 144 F.3d at 159.  FMLA also provides protection in the event an employee is discriminated against

for exercising those rights.  *Id.* at 159-60 (*citing* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. §

825.220)).  The First Circuit has described these provisions as being "proscriptive."  *Hodgens*,

144 F.3d at 160.

When prescriptive rights are in controversy, as in this case, "[t]he issue is simply whether

the employer provided its employee the entitlements set forth in the FMLA—for example, a

twelve-week leave or reinstatement after taking a medical leave."  *Id.* at 159.  "Because the issue

is a right to an entitlement, the employee is due the benefit if the statutory requirements are

satisfied, regardless of the intent of the employer."  *Id.*

Where, as here, a plaintiff adduces no direct evidence of FMLA-based discrimination, the

plaintiff must first establish a *prima facie* case, as required by the *McDonnell-Douglas*

framework.  For an interference-type claim, a plaintiff must show that: (1) he was an "eligible

employee" under the FMLA; (2) the employer was a "covered employer" under the FMLA; (3)

the plaintiff gave his employer adequate notice of his request for protected leave; (4) for a

covered reason; and (5) he was not returned to an equivalent position at the end of his leave.

*Furtado v. Std. Parking Corp.*, 820 F. Supp. 2d 261, 280 (D. Mass. 2011).  Similarly, a *prima*

*facie* case for a retaliation-type claim requires a plaintiff to demonstrate that (1) he availed

himself of a protected right under the FMLA; (2) he was adversely affected by an employment

decision; and (3) he was treated less favorably than an employee who had not requested leave

under the FMLA, or the adverse decision was made because he sought protection under the

FMLA.  *See id.* at 279-80.

### 1.    Interference

Plaintiff contends that he was eligible for FMLA protection due to his chronic back

condition, which required intermittent treatment from a chiropractor.  In order to be eligible for

FMLA leave, an employee must demonstrate that he has a "serious health condition," defined as

"an illness, injury, impairment, or physical or mental condition that involves . . . continuing

treatment by a health care provider."  29 U.S.C. § 2612(a)(1)(D); 29 U.S.C. § 2611(11)(B).

Upon such a showing,  FMLA allows for intermittent leave when "there is a medical need for

leave and it must be that such medical need can best be accommodated through an intermittent or

reduced leave schedule."  29 C.F.R. § 825.202(a), (b).

     An employer has the right under FMLA to require that the employee support his request

for leave with medical certification issued by the employee's health care provider.  29 U.S.C.

§ 2613(a); 29 C.F.R. 825.305(a).  The regulations clearly provide that "[a] certification that is

not returned to the employer is not considered incomplete or insufficient, but constitutes a failure

to provide certification."  29 C.F.R. § 825.305(c).  When an employee fails to provide

certification, "the employer may deny the taking of FMLA leave."  29 C.F.R. § 825.305(d).

     It is undisputed that plaintiff never submitted a medical certification.  First Notice was

therefore within its rights to deny him FMLA leave on that basis.  Accordingly, plaintiff's claim

for interference with his FMLA rights fails as a matter of law.[6]

---

[6] Defendants contend that plaintiff's retaliation claim fails for the same reason.  However, a plaintiff, as here, who makes known to his employer an intent to request FMLA leave has the right not to suffer adverse action as a result of that disclosure, even if he does not submit the necessary certification before the adverse action is taken against him.

2.      **Retaliation**

a.      ***Prima Facie* Case**

I.      **Protected Activity**

Plaintiff further contends that he was terminated in retaliation for making known to Ronan his intent to request FMLA leave.  Similar to protected activity under the ADA and Title VII, courts have held that a request for leave is protected under FMLA if the employee had a reasonable belief that he was entitled to FMLA leave.  *See, e.g., Williams v. Crown Liquors of Broward*, Inc., 878 F. Supp. 2d 1307 (S.D. Fla. 2012).  Here, it is undisputed that plaintiff had been granted leave in the form of excused tardiness on a number of previous occasions.  It is undisputed that, when denied that leave in the absence of a medical certification, he requested a certification from Caprile.  It is further undisputed that Caprile agreed to, and did in fact, complete that certification.  A regular employee, untrained in the law, cannot be expected to know or fully understand the legal definition of "medically necessary" leave.[7]  He can reasonably rely on his doctor and his past experience.  Considering undisputed evidence just-described,  a reasonable juror could conclude that plaintiff reasonably believed he was entitled to FMLA leave.  Accordingly, for the purposes of summary judgment, the Court finds that when he informed Ronan of his intent to request it he engaged in protected activity.

ii.      **Adverse Employment Action**

The second requirement of a *prima facie* case of retaliation is proof that the plaintiff suffered an adverse employment action.  There is no dispute that plaintiff was terminated, and

---

[7] Whether the FMLA leave plaintiff sought was "medically necessary" under the law is a distinct issue on which the Court makes no determination.  The Court notes, however, that it is doubtful considering the undisputed evidence suggesting that plaintiff was able to receive treatment without interruption during the period when he was denied leave.

18

that termination is an adverse action.

### iii.    Causation

The third element of a *prima facie* case of retaliation is some evidence that the adverse decision was made because plaintiff sought protection under the FMLA.

As with the ADA retaliation claim, plaintiff contends that the temporal proximity of his FMLA discussion with Ronan (at the September 7 meeting) to his suspension (on September 9) and termination (on September 14) is sufficient to establish the causation element.  With regard to the FMLA leave request, plaintiff also alleges that he told his direct supervisor, Garcia, that he had a completed medical certification in his vehicle on the same day he was later suspended (September 9).   As a result, plaintiff's temporal argument with regards to causation is perhaps even stronger with respect to his FMLA retaliation claim.  *Calero-Cerezo*, 355 F.3d at 25 (finding that "sufficient temporal proximity between the protected conduct and the employment action . . . [makes] out a prima facie case"); *but see Wright*, 352 F.3d 478 (stating that "chronological proximity does not by itself establish causality").  *See also Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) ("close temporal proximity between two events may give rise to an inference of causal connection.").   Taking into account the extremely close temporal proximity in this case, the Court concludes that plaintiff has made out a *prima facie* case of retaliation.

### b.    Legitimate Nondiscriminatory Reason

The burden again shifts to defendants to offer a legitimate, nondiscriminatory reason for terminating plaintiff.  *Wright*, 352 F.3d at 478.  Here, defendants offer the same reason described above in reference to the ADA retaliation claim – that plaintiff was terminated for "negativity"

in the workplace.  Under the circumstances, defendants have offered proof of a legitimate, nondiscriminatory reason for the termination.

### c.    Pretext

The final step of the analysis again requires plaintiff to offer proof of pretext.  *See Billings*, 515 F.3d at 55.  Plaintiff relies on the same evidence described in the ADA section above in an attempt "to show pretext. . . through 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons.'" *Id.* at 55 -56 (quoting *Hodgens*, 144 F.3d at 161).  Plaintiff does not distinguish between the evidence of pretext with regards to ADA and FMLA.  The only piece of uncontested evidence that applies uniquely to the FMLA claim is plaintiff's testimony that he informed his direct supervisor that he had the completed medical certification ready to be submitted only hours before he was suspended.  If anything, this additional piece of evidence makes it slightly more likely that a reasonable juror would conclude that the defendants' proffered reason is pretextual. Considering this evidence, and the other evidence of pretext as analyzed in the ADA section above, the Court can ascertain no reason why it should view the FMLA retaliation claim any differently on summary judgment.  Accordingly, the Court finds that a reasonable juror could conclude that the proffered reason for plaintiff's termination was pretextual.

For the above reasons, the Court will deny summary judgment as to plaintiff's claim for retaliation under the FMLA.

### D.    HIPAA-Based Claims

Plaintiff further contends that he was wrongfully terminated in violation of public policy for reporting HIPAA violations to First Notice management.

In order to survive summary judgment of his wrongful termination claim, plaintiff must identify a well-defined public policy that was violated when his employment was terminated. *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 472-73 (1992).  Claims of wrongful termination, which represent a narrow exception to the general rule of at-will employment in Massachusetts, allow "[r]edress . . . for employees who are terminated for asserting a legally guaranteed right (*e.g.*, filing a workers' compensation claim), for doing what the law requires (*e.g.*, serving on a jury), or for refusing to do that which the law forbids (*e.g.*, committing perjury)."  *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149-150 (1989).

The Supreme Judicial Court has limited the public policy exception, such that it does not protect all employee acts that are "appropriate [or] socially desirable."  *Smith-Pfeffer*, 404 Mass. at 150.  Nor does it extend so far as to cover all acts by an employee that are directed to illegal, unsafe, or unethical conduct.  *See Wright v. Shriners Hospital*, 412 Mass. 469, 472-473 (1992) (no violation of public policy where nurse fired for criticizing quality of care rendered to patients at hospital, as required by nursing ethical code).

Although there is no bright line between protected and unprotected actions, the Massachusetts courts have nonetheless established some guideposts.  Reporting, resisting, or refusing to participate in criminal activity is clearly protected.  *See, e.g., Shea v. Emmanuel College*, 425 Mass. 761, 762-763 (1997) (employee reported theft of funds); *Smith v. Mitre Corp.*, 949 F. Supp. 943, 951 (D. Mass. 1997) (employee reported fraud and false claims by government contractor); *Hutson v. Analytic Sciences Corp.*, 860 F. Supp. 6, 10-11 (D. Mass.

1994) (employee complained about fraud in defense contract).[8]  Similarly, employees are generally protected when they report, resist, or refuse to participate in activity that presents a threat to public health or safety.  *See, e.g., Falcon v. Leger*, 62 Mass. App. Ct. 352, 364-65 (2004) (employee resisted safety standard violations that "presented a threat to the public safety and was otherwise unlawful"); *Hobson v. McLean Hospital*, 402 Mass. 413, 416-417 (1988) (employee attempted to enforce fire safety standards).[9]

Plaintiff's complaint here—that First Notice employees were not properly disposing of documents containing individually identifiable health information in violation of HIPAA—implicates privacy issues.  However, defendants contend that the actions plaintiff complained of, though violations of internal policy, were not technically HIPAA violations, and therefore a claim of wrongful termination cannot be brought on the basis of such complaints. *See Falcon*, 62 Mass. App. Ct. at 362 ("Massachusetts law does not protect at-will employees who claim to be fired for their complaints about internal company policies or the violation of company rules.").

It is undisputed that defendant First Notice, as a clearing house for insurance claims, is a "covered entity" for the purposes of HIPAA.  HIPAA requires such an entity to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information," but does not specify what those safeguards must be.  45 C.F.R. 164.530(c).

---

[8]  The fact that the employee reported the problem internally, rather than to law enforcement or regulatory authorities, does not ordinarily compel a different result.  *See Shea*, 425 Mass. at 762-63;  *Falcon*, 62 Mass. App. Ct. at 364 ("we look to the substance of the complaint rather than to whom it is presented").

[9]  The legislature has forbidden public employers from terminating employees in retaliation for threatened or actual disclosure of something "that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment."  *See* Mass. Gen. Laws ch. 149, § 185(b).  First Notice, however, is a private, not public, employer.

HIPAA also provides that "[a] covered entity must reasonably safeguard protected health information to limit incidental uses or disclosures made pursuant to an otherwise permitted or required use or disclosure." *Id.* Defendants have put forth undisputed evidence that the Department of Health and Human Services, which administers HIPAA, has interpreted these regulations so as not to require any particular method of safeguarding and disposing of protected health information. That, however, does not establish the actions plaintiff complained of (that is, disposing of documents with personal health information in unprotected trash canisters) are necessarily lawful or proper. Instead, it grants entities freedom to enact policies to safeguard protected information that are tailored to their unique situations.

Nonetheless, the court cannot conclude that the requirements for disposal of HIPAA-protected materials was a well-defined public policy, such that an at-will employee cannot be terminated in violation of that policy. Furthermore, and in any event, plaintiff's wrongful termination claim cannot withstand summary judgment because causation is more attenuated than with respect to his other two retaliation claims. With respect to this claim, there is compelling additional evidence that he lodged the very same HIPAA complaints months earlier and suffered no adverse action as a consequence. Accordingly, the Court finds that no reasonable juror could conclude that plaintiff's mentioning of the HIPAA violations in his meeting with Ronan was the cause of his ultimate termination.

Summary judgment will therefore be granted as to the claim for retaliatory termination in violation of public policy.

**III.  Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to

the plaintiff's claims based on purported HIPAA violations and for interference under the

FMLA, and DENIED as to plaintiff's claims for retaliation under the ADA, Mass. Gen. Laws ch.

151B, and the FMLA.

**So Ordered.**


                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated: February 14, 2013                            United States District Judge